IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TRAFFIC SPORTS USA | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | 11 CV 1454 |
| MODELOS RESTAURANTE, INC. | ) | |
| d/b/a SAJUMA RESTAURANT LOUNGE | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF REQUEST FOR JUDGMENT BY DEFAULT

Plaintiff, Traffic Sports USA by its attorneys, Paul J. Hooten & Associates, files

this Memorandum of Law and says:

**POSTURE OF THIS CASE**

On March 24, 2011, Traffic Sports USA, filed suit against Modelos Restaurante,

Inc., d/b/a Sajuma Restaurant Lounge. The lawsuit charged the Defendants with a violation of

Section 705 of the Federal Communications Act of 1934, as amended, 47 U.S.C. §605 (the

"Statute").

Upon the failure of the Defendant, Modelos Restaurante, Inc., d/b/a Sajuma

Restaurant Lounge to timely file an Answer or any other responsive pleading, the Plaintiff filed

and requested that a default judgment be entered against the Defendant.  A Clerk's Notation of

Default is on file with this Court.  Pursuant to Rule 55(b)(2) of the Federal Rules of Civil

Procedure, a default judgment is appropriate.

When an application is made to the court under Rule 55(b)(2) for the entry of a

judgment by default, the district judge is required to exercise sound judicial discretion in

1

determining whether the judgment should be entered.  *Wing v. East River Chinese Restaurant*, 884 F. Supp. 663, 669 (D.C.N.Y. 1995).  Additionally, in deciding a motion for judgment on the pleadings, the Court of Appeals applies the same standard as that applicable to a motion for failure to state claim upon which relief may be granted, accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party. Fed. Rules Civ. Proc. Rule 12(b)(6), (c), 28 U.S.C.A.  *Burnette v. Carothers*, 192 F.3d 52 (2d Dept. 1999). Accordingly, the only issue remaining to be decided in this case is the amount of damages to which the Plaintiff is entitled from the Defendants as a result of his violation of the Statute.

## FACTS

Traffic Sports USA, entered into a closed-circuit television license agreement (the "License Agreement") to exhibit the closed-circuit telecast of the March 28, 2009 CONCACAF World Cup Qualifier Tournament, including but not limited to the Trinidad & Tobago v. Honduras World Cup Qualifier Game (the match and all related bouts are collectively referred to as the "Event"), at closed-circuit locations such as theaters, arenas, bars, clubs, lounges, restaurants and the like throughout New York.

In the State of New York, the Event was legally available to the public only through very limited means.  A commercial establishment, such as a bar, restaurant or lounge, could receive and broadcast the Event only after entering into a contractual agreement with Traffic Sports USA.  A residential cable subscriber could only obtain the Event by purchasing it for an additional fee through the subscriber's residential pay-per-view cable system.

The interstate satellite transmission of the Event was electronically coded or scrambled and was not intended for the use of the general public. If a commercial establishment was authorized by Traffic Sports USA to receive the Event, it was provided with the electronic

2

decoding equipment and the satellite coordinates necessary to receive the signal. For an authorized residential pay-per-view customer to receive the Event, its cable system would "authorize" the residential converter to enable it to be capable of unscrambling the transmission.

The authorized commercial establishments which contracted with Traffic Sports USA were required to pay to Traffic Sports USA a sublicense fee. In addition, these establishments were contractually required to charge their patrons an admission fee for attending the exhibition of the Event.

The Defendant, Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge, a commercial establishment located at 1770 New York Avenue, Huntington Station, NY.  On March 28, 2009, without authorization, the Defendant or agents, servants and/or employees of the Defendant intercepted and received or assisted in the interception and receipt of the transmission of the Event. They thereupon broadcast or assisted in the broadcast of the Event to the patrons of Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge.

On the night of the Event, Earl L. Covington observed the Event being telecast to the patrons of Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge.  A copy of Earl L. Covington's affidavit is attached hereto as Exhibit A and incorporated herein by reference. While the Event was being broadcast in Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge, Earl L. Covington , observed that there were approximately fifteen (15) patrons located on the premises.

As Traffic Sports USA maintained proprietary rights in the signal of the Event, all unlawful acts of interception, receipt and broadcast of the signal by the Defendant were in violation of Traffic Sports USA rights and caused Traffic Sports USA to suffer damages.

3

## DAMAGES UNDER THE COMPLAINT

The Statute in General

      The Statute provides inter alia that:

[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. §605(a). Thus it protects against the theft of satellite communications such as the Event. *See, Chanayil v. Gulati*, 169 F.3d 168 (2d. Dept 1999). *Viola v. A & E Televison Networks*, 433 F. Supp. 2d 613 (W.D. Pa. 2006). *ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp.2d 416 (S.D.N.Y. 1999). *Arons v. Donovan*, 882 F. Supp. 379 (D.N.J. 1995). *Mehdi v. Boyce*, 931 F. Supp. 268 (S.D.N.Y. 1996). Accordingly, all acts of unlawful interception, receipt and broadcast of the signal of the Event were in violation of the Statute.

In order to deter the unlawful use of communications such as the Event, Congress specifically designed the Statute to provide "both Prosecutor[s] and civil plaintiffs [with] the legal tools they need to bring piracy under control." Trademark & Satellite Acts, P.L.-6678, 1988 U.S. Cong. & Admin. News 7, 5577, 5658; *See*, *DirecTV, Inc. v. Benson*, 333 F.Supp.2d 440 (M.D.N.C. 2004). Therefore, the Statute includes severe penalties, both civil and criminal, for those who intercept, receive and/or broadcast protected communications. *Id*. at 445. *See generally*, §605(e).[1] Moreover, Congress has equated a violation of the Statute to theft of service. *See* 1988 U.S. Code Cong. & Admin. News. 7, 5577, 5642-43. In 1988, in an effort to

---

[1] The criminal penalties include fines and imprisonment. *See*, §605(e)(1) and (e)(2).

4

further deter theft, Congress amended the Statute to provide for more severe penalties for violations. *Id*. at 5657.

Accordingly, a party aggrieved under the Statute may recover statutory damages of up to $10,000.00 for each violation thereof. §605(e)(3)(C)(i)(II). Section 605(e)(3)(C)(i)(II) provides that "the party aggrieved may recover an award of statutory damages for each violation of subsec. (a) involved in the action in a sum of not less than $ 1,000 or more than $ 10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $ 10,000, or more than $ 100,000, as the court considers just."

Moreover, Section 605(e)(4) provides that "Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a), shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both. For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation."

Moreover, if the Court finds that the violation of the Statute was "willfully and for purposes of direct or indirect commercial advantage or private financial gain…" the Court may award additional damages of up to $100,000.00 for each violation. §605(e)(3)(C)(ii). Furthermore, a Court shall award full costs, including reasonable attorney's fees. §605(e)(3)(B)(iii),  Because Traffic Sports USA  constitutes an aggrieved party under the

5

Statute, *see* §605(d)(6), Traffic Sports USA is entitled to damages from the Defendant for his unlawful acts.

It is obvious that the Defendant's interception, receipt and broadcast of the Event was not innocent.  Section 605(e)(3)(C)(iii) provides for limited damages to the aggrieved party "[i]n any case where the court finds that the violator was not aware and has no reason to believe that his acts constituted a violation of this section…"  However, as stated by Congress, this type of situation occurs rarely,

> [i]t is not intended that this provision serve in any way as a defense to a determination of liability under subsection (a), but rather only as a provision to be exercised in the court's discretion for those rare instances of ignorance of the law on the part of one adjudged to have violated it.
> Cable Communications Policy Act, P.L. 98-549, 5 U.C. Cong. News. 84 Bd. Vol. 8,

4745, 4751.  Clearly, this was not the instant situation.

As Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge is a commercial establishment, it could not have obtained the transmission or the Event had the Defendant not undertaken specific wrongful actions to intercept and/or receive and broadcast the telecast.  In order for an unauthorized commercial establishment to receive a broadcast such as the Event, there must be some wrongful action, such as using an unauthorized decoder, obtaining cable service and illegally altering the cable service to bring the signal of the Event into the establishment.  Because the Defendant must have committed wrongful acts in order to intercept and/or receive and broadcast the Event, there is no basis for limiting Traffic Sports USA, Inc. relief to the $10,000 provided for in §605(e)(3)(C)(i).

## Statutory Damages Under §605(e)(3)(C)(i)(II) and §553(c)(3)(A)(ii)

As its first basis for relief, Traffic Sports USA is requesting statutory damages pursuant to §605(e)(3)(C)(i)(II).  *See, Cablevision of Southern Conn., Ltd. Partnership v. Smith*, 141

F.Supp.2d 277 (D. Conn. 2001). Section 605(d)(6) provides that "any person with proprietary rights in the intercepted communication ..." may bring a private cause of action against one who acts in violation of the Statute. Moreover, Section 605(e)(3)(C)(i)(II) provides that "the party aggrieved may recover an award of statutory damages for each violation of subsec. (a) involved in the action in a sum of not less than $ 1,000 or more than $ 10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $ 10,000, or more than $ 100,000, as the court considers just."

Additionally, Section 553(a)(1) provides, "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Section 553 (c)(3)(A)(ii) provides further that "the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just."

Pursuant to the Statute, the amount of statutory damages to which Traffic Sports USA is entitled for the violation shall be not less than $1,000.00 and not more than $10,000.00 for each statutory violation.

For the reasons set forth, Traffic Sports USA believes it is entitled to full statutory damages in the amount of $20,000.00 for the violation of each Statute.

As stated supra, on March 28, 2009, the Defendant or agents, servants and/or employees of the Defendant intercepted and received or assisted in the interception and receipt of the live telecast of the Event. They then broadcast or assisted in the broadcast of the Event to the patrons at Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge for viewing therein. The patrons

7

at Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge purchased meals and/or drinks while viewing the Event. The patrons whom the Defendant permitted without authorization to view the Event would otherwise only have been able to view the Event at a commercial establishment by paying an admittance fee at an establishment authorized by Traffic Sports USA to receive the transmission.

The Defendant broadcast the Event to the patrons at Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge without paying any sublicense fees to Traffic Sports USA. To date, no amount has been paid to Traffic Sports USA to compensate it for the illegal broadcast of the Event in Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge.

Statutory damages are appropriate where actual damages are difficult to prove.  *Tiffany (NJ) Inc. v. Luban*, 282 F.Supp.2d 123 (S.D.N.Y. 2003).  *Getaped.Com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002).  The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. *Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.*, 246 F.Supp.2d 394 (E.D. Pa. 2002). In the instant case, as more fully discussed infra, it would be impossible to determine the full extent of the profits lost by Traffic Sports USA and the additional damages sustained by Traffic Sports USA as a result of the Defendant's unlawful actions.

Accordingly, it is appropriate for Traffic Sports USA to elect to receive statutory damages.

In the instant case, it is difficult to determine the full extent of the profits lost by Plaintiff and the additional damages sustained by Plaintiff as a result of the Defendant's unlawful actions. Accordingly, we ask that that Court highly consider the statutory damages permitted in a case such as this.

8

However, Plaintiff is able to prove actual damages which include lost profits to the Plaintiff, the profits gained by the Defendants through unlawful means, detriment to Plaintiff's goodwill and reputation, and loss of future business. Moreover, Plaintiff believes that as a means of deterrence to the Defendants, Plaintiff must be compensated beyond its actual damages based on Defendant's willful actions.

"A method commonly used by courts to determine an appropriate damages award is to assess a per person charge based upon the number of individuals in the establishment at the time of the broadcast." *J&J Sports Prods. v. Hot Shots, Inc*., 2010 U.S. Dist. LEXIS 91058 (2010); *Cablevision Sys. Corp. v. 45 Midland Enters., Inc*., 858 F. Supp. 42, 45 (S.D.N.Y. 1994) (awarding damages on a per patron basis).

"In this district, courts have often multiplied the number of patrons by $54.95, the price an individual would pay to view the event at home on a pay-per-view channel." *J&J Sports Prods. v. Hot Shots, Inc*., 2010 U.S. Dist. LEXIS 91058 (2010); *See, e.g., J & J Sports Prods. v. Arhin*, 2009 U.S. Dist. LEXIS 32852, 2009 WL 1044500 at *1 (E.D.N.Y. Apr. 17, 2009); *Garden City Boxing Club, Inc. v. Taqueria La Mixteca, Inc*., 2008 U.S. Dist. LEXIS 70489, 2008 WL 4107130 at *2 (E.D.N.Y. Sept. 4, 2008); *Kingvision Pay-Per-View Ltd. v. Cazares*, 2006 U.S. Dist. LEXIS 50753, 2006 WL 2086031 at *3-4 (E.D.N.Y. July 25, 2006).

The impact of theft of this type is far-reaching throughout the entertainment industry. According to the Office of Cable Signal Theft of the National Cable and Telecommunications Association, the cable industry loses an estimated 3 Billion Dollars annually as a result of the

9

theft of cable signals.[2] Cable Piracy Fact Sheet. Not only do these acts of theft cause legitimate businesses to lose money, but they also weaken the cable signal, thereby adversely affecting the quality of the picture received by authorized users.

Similarly, the unauthorized interception, receipt and broadcast of the Event and other closed-circuit programming threatens the viability of the closed-circuit industry. There are no countervailing social or policy considerations which justify the unauthorized interception of these broadcasts. *DirecTV, Inc. v. Bertram,* 296 F.Supp.2d 1021 (D. Minn. 2003).

The sublicense fees which Traffic Sports USA charges to an authorized commercial establishment are based upon specific factors, including the capacity of the bar.

In the present case, Plaintiff first and foremost lost a profit of $700.00 which is what Defendant would have been charged to show this Event at the Defendants' establishment.

Moreover, as demonstrated by the investigator's Affidavit attached to Plaintiff's Memorandum of Law, there were approximately 15 patrons of the Defendants' establishment. Therefore, Defendant's profit was approximately $824.25 for the 15 patrons of Defendant's establishment.

Those individuals at Defendant's establishment could have gone to an establishment licensed by the Plaintiff to view this Event, but instead went to Defendants' establishment. The fact that there were such a considerable amount of people viewing this Event, whether within the

---

[2] In 1995, NCTA's Office of Cable Signal Theft estimated that cable theft cost the industry $5 billion, or almost 20% of gross industry revenues in 1995. A similar theft rate would equate to roughly $8 billion this year, which, in turn, means that the copyright owners lose millions of dollars a year from theft. According to a 1998 White Paper on Cable Decoder Piracy, "[o]ver the last several years, decoder piracy has advanced well beyond the initial annoyance of individuals selling small quantities of homemade black boxes. Federal investigators have uncovered large-scale sophisticated illegal decoder distribution enterprises ("IDEs") throughout the country. What might once have been a small-time, illegal cottage industry is now a nationwide multi-million dollar business." Cable Decoder Piracy 1998 White Paper Update – A Summary of Federal Law In the Cable Industry's Anti-Piracy Arsenal, Hogan & Hartson, Nov. 3, 1998, at 3-4.

Defendants' establishment, lends support to Plaintiff's argument that its goodwill and reputation have been damaged.  Plaintiff has additionally lost future revenue as a result.

 As a result of theft by the Defendants and others, Traffic Sports USA has lost and will continue to lose as customers legitimate commercial establishments which are unwilling and financially unable to compete with those unauthorized commercial establishments, such as Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge, which steal sports and other closed-circuit programming.  Because these unauthorized commercial establishments offer the stolen programming to their patrons for no fee or for a fee which is less than the authorized establishments are required to charge, the legitimate commercial establishments with the right to broadcast closed-circuit programming cannot attract paying customers.  As a result, the authorized commercial establishments fail to recover the sublicense fees paid, suffer the loss of patrons and incur financial loss. When the unauthorized commercial establishment advertises the availability of the stolen programming, the number of patrons at the unauthorized commercial establishment increases and, as a result, Traffic Sports USA and the authorized commercial establishments suffer additional losses.

 Theft of closed-circuit broadcasts, such as the Event, by unauthorized commercial establishments, such as Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge, adversely affects both Traffic Sports USA and its customers. Traffic Sports USA pays substantial fees to obtain the right to sublicense the broadcast of closed-circuit programming to authorized commercial establishments.  Traffic Sports USA primary source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit sports and entertainment programming such as the Event.

11

Clearly, the Defendant's actions have the potential to erode the base of Traffic Sports USA customers. Each patron of Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge, is lost as a future patron of authorized broadcasts. *See Joe Hand Promotions, Inc. v. Rennard Street Enterprises, Inc*., 975 F. Supp. 746 (E.D. Pa. 1997). But for the Defendant's unauthorized broadcast of the Event, all or some of the patrons of Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge would have become paying patrons and directly increased the fees paid to Traffic Sports USA by its authorized commercial establishments.

Further, Traffic Sports USA has suffered damage to its goodwill and reputation and loss of its right and ability to control and receive fees for the transmission of the Event. See *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.*, 640 F.Supp. 1159, 1161 (D. Mass. 1986). When negotiating sublicense fees, Traffic Sports USA generally represents to legitimate commercial establishments the locations of other authorized commercial establishments licensed to receive the programming. Therefore, when an unauthorized commercial establishment intercepts, receives and broadcasts closed-circuit programming, such as the Event, Traffic Sports USA reputation and goodwill suffers from what appears like a misrepresentation.     Traffic Sports USA should receive compensation from the Defendant for these losses suffered. Furthermore, an incalculable element of damages is the ill-will and possible loss of future business from legitimate commercial establishments which refuse to pay sublicense fees because they cannot compete with unauthorized commercial establishments which steal closed-circuit programming, such as the Event.

The continued viability of Traffic Sports USA as a business concern depends upon the willingness and ability of legitimate commercial establishments to pay sublicense fees for the right to broadcast closed-circuit sports and entertainment programming, such as the Event. If

12

such programming is made available to the public for no fee at unauthorized commercial establishments which have not purchased the right to broadcast such programming, legitimate commercial establishments will find no reason to purchase the right to legally broadcast this type of programming. Traffic Sports USA is operating a legitimate business of the type that Congress specifically sought to protect. That protection, however, is threatened by the Defendant's actions. This Court must use the full power of the Statute to punish the Defendant for his acts of theft. If rampant theft of service is allowed to go unpunished and Traffic Sports USA and similar distributors of protected communications continue to suffer losses as a result of the theft, these businesses could be forced to curtail distribution of this programming, thereby depriving the people of the State of New York of the ability to view these sports and entertainment events.

It is Plaintiff's position that its loss in goodwill, reputation, and future revenue are estimated to be $2,500.00. Accordingly, Plaintiff's actual damages are $4,024.25.

The arguments set forth herein are also applicable in supporting damages under 47 U.S.C. §553(c)(3)(A)(ii) in the amount of $10,000.00 which provides "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Section 553 (c)(3)(A)(ii) provides further that "the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just."

### Damages for Willful Act Under §605(e)(3)(C)(ii) and §553(c)(3)(B)

As its second basis for relief, Traffic Sports USA is requesting damages pursuant to §553(c)(3)(B)and 605(e)(3)(c)(ii) because the Defendant's actions were willful and "for purposes of direct or indirect commercial advantage or private financial gain". Section 605(e)(3)(C)(i)(II)

13

provides that "In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a)."  Section 553(c)(3)(B) provides that "In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $ 50,000."  In *Comcast of Illinois X v. Multi-Vision Electronics, Inc*., 491 F.3d 938 (8th Cir. 2007) the Court of Appeals for the Eighth Circuit held that "enhanced damages award for willful violation of Act was warranted." *Id.* at 938.

　　As set forth supra, because of the absence of any way in which the Defendant could have "innocently" accessed the broadcast of the Event, it is apparent that he specifically and willfully acted to illegally intercept the transmissions of the Event for his commercial advantage.

　　Clearly, the Defendant's actions indicate disregard of and indifference to the Statute. The Defendant knew that it was wrong to receive, intercept and divert the cable service and the Event and to broadcast it in Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge.  Similarly, the Defendant knew that h**is** actions were unlawful yet, with total disregard for the Statute, he nevertheless intercepted and received the transmission and broadcast it to the patrons of Modelos Restaurante, Inc., d/b/a Sajuma Restaurant Lounge. Accordingly, because the Defendant's actions were willful, Traffic Sports USA is entitled to additional damages.

　　It is patently obvious that the Defendant's actions were "for the purposes of direct or indirect commercial advantage or private financial gain." §605(e)(3)(C)(ii). As stated by Congress,

14

> [i]t is further intended that the term "direct or indirect
> commercial advantage or private financial gain" be
> interpreted broadly by both the courts in deciding actions,
> and the Department of Justice in pursuing actions, under this
> section. Those who willfully violate subsection (a) and
> directly or indirectly enjoy commercial gain from those
> violations, may be reached.

Cable Communications Policy Act, P.L. 98-549, 5 U.S. Congo News. '84 Bd. Vol.-8,

4745,4750.

Because the Event was broadcast to the patrons of Modelos Restaurante, Inc., d/b/a

Sajuma Restaurant Lounge, the Defendant's purpose and intent in exhibiting the Event was to

secure a private financial gain and direct commercial advantage by misappropriating Traffic

Sports USA licensed exhibitions and infringing upon Traffic Sports USA rights, while avoiding

proper payment to Traffic Sports USA.

By interpreting the statutory language broadly as directed by Congress, the Court must

find that the Defendant's actions were for his commercial gain as set forth in the Statute.

Accordingly, as the Defendant's actions were willful and for commercial advantage, Traffic

Sports USA is entitled to additional damages under the Statute.

In addition to actual damages, "courts use a variety of factors in determining whether a

defendant's willful conduct justifies enhanced damages, including whether there is evidence of

(i) repeated violations; (ii) significant actual damages suffered by plaintiff; (iii) substantial

unlawful monetary gains by defendant; (iv) defendant's advertising for the event; and (v)

defendant's collection of a cover charge or premiums for food and drinks." *J&J Sports Prods. v.

Hot Shots, Inc*., 2010 U.S. Dist. LEXIS 91058  (2010); *J & J Sports Prods., Inc. v. Alvarez*, 2009

U.S. Dist. LEXIS 89602, 2009 WL 3096074 at *5 (S.D.N.Y. Sept. 25, 2009); *Kingvision v. El*

15

*Rey Del Bistec Y Caridad, Inc*., 2001 U.S. Dist. LEXIS 20531, 2001 WL 1586667, at *2 (S.D.N.Y. Dec. 12, 2001).

It must be noted that "The broadcast of an event without authorization is a deliberate act, and thus establishes willfulness." *J &J Sports Prods. v. Hot Shots, Inc*., 2010 U.S. Dist. LEXIS 91058  (2010); *See also Time Warner Cable of New York City v. Taco Rapido Rest*., 988 F. Supp. 107, 111 (E.D.N.Y. 1997) ("In order for [defendant] to receive the closed-circuit broadcast, it had to have engaged in some deliberate act. . . ."); *Time Warner Cable of New York City v. Googies Luncheonette, Inc*., 77 F. Supp. 2d 485, 490 (S.D.N.Y. 1999) ("[s]ignals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems").  Therefore, in the instant case, the fact that Defendants broadcast this Event to its patrons for a profit without a license from the Plaintiff is evidence of Defendants' willfulness.

In *J&J Sports Prods. v. Hot Shots, Inc*., 2010 U.S. Dist. LEXIS 91058  (2010), the court stated that "Taking all of these factors into account, I recommend that plaintiff be awarded an enhancement of **three times** the damages award, or $8,242.50, for willfulness, for a total statutory award of $10,990."  *See J&J Sports Prods., Inc. v. Forbes*, 2008 U.S. Dist. LEXIS 101698, 2008 WL 5263732 at *6 (E.D.N.Y. Dec. 17, 2008) (**trebling for willfulness** awarding plaintiff $1,000 in statutory damages, $3,000 in enhanced statutory damages, and $550 in costs); *J&J Sports Prods., Inc. v. Rodrigues*, 2007 U.S. Dist. LEXIS 45586, 2007 WL 1726462 at *7 (E.D.N.Y. Apr. 19, 2007) (**awarding treble damages** in which defendants showed the event to only 8 patrons, $1,000 in statutory damages, plus an additional $3,000 in enhanced damages, $ 1,125 in attorney's fees, and $ 450 in costs, for a total award of $ 5,575); *J&J Sports Prods., Inc. v. Drake*, 2006 U.S. Dist. LEXIS 74017, 2006 WL 2927163 at *5 (E.D.N.Y. Oct. 11, 2006) (awarding a factor of **three times** for willfulness where thirty people were present for the illegal

16

broadcast [$4,000 in damages plus $ 1,200 in attorneys' fees for a total judgment of $ 5,200.]); *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F. Supp. 2d 485, 491 (S.D.N.Y. 1999) (awarding plaintiff $4,000, together with $635 in attorney's fees, against defendant 1; $15,000, together with $ 35 in attorney's fees and costs against defendant 2, and $9,000, together with $635 in attorney's fees and costs against defendant 3).

Therefore, in the present case as there were estimated to be approximately 45 illegal viewers of this Event, the Court must balance the equities and award Plaintiff damages in excess of its actual damages. It is Plaintiff's position that as its actual damages are approximately $4,024.25 and as it is customary for this Court to award treble damages to plaintiffs in similar cases, it is only equitable that Plaintiff should be awarded at least $12,072.75 plus interest, costs and disbursements based on Defendants' willful actions.

### Interest and Costs

As its third basis for relief, Traffic Sports USA is requesting payment for its costs pursuant to §605(e)(3)(B)(iii) and §553(c)(2)(C). Section 605(e)(3)(B)(iii) provides that "The Court shall direct the recovery of full costs… to an aggrieved party who prevails," under this statute. Section 553(c)(2)(C) provides that "The Court may direct the recovery of full costs… to an aggrieved party who prevails," under this statute.

Pursuant to the Statute, said award is mandatory. Section 605(e)(3)(B)(iii) states, "(the Court... shall direct the recovery of full costs, ..." See Maxie's,1991 WL 58350, No. CV 88 2834.

Attached hereto as Composite Exhibit B and incorporated herein by reference is an Affidavit of Enrique Sanz, Vice President of Traffic Sports USA which sets forth the facts giving rise to the instant action.

17

The costs herein to date have been $470.00.  Additionally, plaintiff requests interest to be awarded in favor of plaintiff, pursuant to the statutory rate of 9% per annum from March 28, 2009 to date totaling $3,078.55.  Furthermore, the Court is advised that the Plaintiff is not requesting  attorneys fees herein.

## **CONCLUSION**

The need for substantial awards to compensate those aggrieved under the Statute and to deter the Defendant and similar individuals and entities has already been recognized in this jurisdiction and other jurisdictions. For the reasons set forth herein, the Plaintiff respectfully requests the aforesaid relief.

This action seeks judgment in the amount of $12,072.75 plus interest at 9% from March 28, 2009 amounting to $3,078.55 plus costs and disbursements of this action in the amount of $470.00 amounting in all to $15,621.30.

Therefore, plaintiff requests default judgment to be entered in favor of plaintiff in the amount of $15,621.30.

Respectfully submitted,
PAUL J. HOOTEN, ESQ. & ASSOCIATES

By:     /s/ Paul J. Hooten
        Paul J. Hooten, Esq.
        5505 Nesconset Highway, #203
        Mount Sinai, NY 11766

18

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of January, 2012, a copy of the

foregoing Memorandum of Law was sent by U.S. Mail to:

Modelos Restaurante, Inc.
d/b/a Sajuma Restaurant Lounge
1770 New York Avenue
Huntington Station, NY 11746

/s/ Paul J. Hooten
Paul J. Hooten

19